Ronnie HILTON, James Livingston a/k/a Bo, Duke, Melvin Hilton, Jerome Graham a/k/a Bull, Rufus Shepard, Jr., a/k/a Shep,* Appellants,

v.

UNITED STATES, Appellee.

Nos. 79–290, 79–314, 79–353, 79–358, and 79–311.

District of Columbia Court of Appeals.

Argued Oct. 9, 1980.

Decided Sept. 2, 1981.

* Argued Nov. 24, 1980.

Russell F. Canan, Washington, D. C., appointed by the court, for appellant Ronnie Hilton.

Leroy Nesbitt, Washington, D. C., appointed by the court, for appellant Livingston.

Maureen M. Dwyer, Washington, D. C., appointed by the court, for appellant Melvin Hilton.

Roderick W. Cash, Jr., Washington, D. C., appointed by the court, for appellant Graham.

Charles W. Halleck, Washington, D. C., appointed by the court, for appellant Shepard.

Charles W. Brooks, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and John A. Terry, and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEBEKER, MACK and FERREN, Associate Judges.

MACK, Associate Judge:

Following a jury trial, each appellant was convicted of three counts of armed robbery, D.C.Code 1973, §§ 22–2901, –3202. In addition, appellants Ronnie Hilton, Melvin Hilton and James Livingston were each convicted of two counts of assault with a dangerous weapon, D.C.Code 1973 § 22–502, and one count of carrying a pistol without a license, D.C.Code 1973, § 22–3204, and appellant Jerome Graham was convicted of two counts of assault with a dangerous weapon and one count of possession of a prohibited weapon, D.C.Code 1973, § 22–3214(b). The charges stemmed from the robbery of a local laundromat and the robbery and assault of the employees and patrons therein.

In these consolidated appeals, appellants allege numerous errors by the trial court. Finding no merit to any of these contentions, we affirm all convictions.

The evidence adduced by the government revealed that in the early morning hours of January 8, 1978, appellants Shepard, Graham and accomplice Rosetta Ross decided to rob the Speed Queen laundromat, a site suggested by Shepard. Shepard drove his companions to appellant Graham's house where a starter pistol was obtained, and the trio proceeded to the laundromat. While Shepard and Ross waited in the car, Graham went inside, asked the patrons a question and then came back outside. Deciding that more help was needed, given the number of patrons, the trio recruited the aid of appellants Ronnie and Melvin Hilton and James Livingston. Upon their return to the laundromat, all appellants except Shepard (who again waited in the car with Ms. Ross) entered the establishment. Moments later, Ross heard a shot from inside the laundromat and went in to investigate. Inside, appellant Graham was keeping watch. Melvin Hilton was pistol-whipping an employee of the laundromat in an attempt to discover the location of money, and Ronnie Hilton had shot one of the patrons. Having gained the desired information, Melvin Hilton proceeded to the back of the laundromat, broke a lock on a locker and removed a metal box containing bills and rolls of coins. Ms. Ross took a number of coins back to the car and then returned to do the same with the dollar bills. Throughout the incident, appellants and Ms. Ross were relieving the patrons of their money and valuables.

Unknown to the principals, the night manager of the laundromat, Haywood Smith, escaped through a back room and succeeded in notifying the police of the robbery. Ms. Ross, on one of her trips to the car, spotted the police approaching and alerted the appellants still inside the laundromat. Shepard immediately departed as he saw police cars approaching. The police arrested Ross, Graham and the Hilton brothers. Appellant Livingston hid behind some clothes dryers and was undetected by police. The police recovered four guns and loose cash. Livingston and Shepard were subsequently arrested.

I.

We will consider appellants' contentions seriatim. Appellants Rufus Shepard, Je-

rome Graham and Melvin Hilton maintain that the trial court erred in denying their motion to compel a mental and physical examination of Rosetta Ross.

Ms. Ross was the government's chief witness. After her direct examination by the government and a recess, defense counsel moved for the physical examination on the basis of counsel's impression that Ms. Ross was showing signs of drug intoxication and upon information received that she was smoking marijuana during the recess.[1] In denying the motion, the trial court concluded:

> I watched her myself. Her answers were extremely lucid and to the point. I see no indication, myself, just of the use of drugs.... It does not prevent cross examination by counsel in respect of the use of any—possible use of any drugs of this date. That certainly is within the scope of—the matter was gone into on direct and it would be within the power of counsel to question into this matter anyway and it would anyhow if there is a problem with respect to competence in the case.

During cross-examination it was revealed that Ms. Ross had admitted herself into St. Elizabeths Hospital several times because she complained of hearing non-existent voices and for treatment of drug addiction. Moreover, she had been admitted once, on court order, after she had been found incompetent to stand trial for shoplifting. She testified that she was a long-time drug addict but had overcome her addiction in 1978 (three months before the laundromat robbery), although she still took drugs on occasion. She had taken the drug ritalin the day before the robbery but claimed that she was not under its influence by the time the robbery occurred. Outside of the "two-drags on a marijuana" cigarette during court recess, she testified she had not taken drugs in the month preceding trial. The marijuana, she told the court, was to help

her relax because she was nervous and was not taken in sufficient quantity to make her "high."

The motion for a physical and mental examination was not renewed thereafter. At the conclusion of Ms. Ross' testimony, counsel for Melvin Hilton moved that the court strike her testimony because she admitted to using marijuana and because of the "incredible nature of her testimony." The trial court denied this motion, concluding that the witness' drug use and any inconsistencies in her account were fully explored during cross-examination and that they were matters of weight and credibility to be assessed by the jury.

■■■ The decision whether to order a physical or psychiatric examination for the purpose of determining competency to testify or to aid the jury in its assessment of a witness' credibility is within the sound discretion of the trial judge. *Rogers v. United States*, D.C.App., 419 A.2d 977 (1980); *United States v. Harrod*, D.C.App., 411 A.2d 1383 (1980); *Ledbetter v. United States*, D.C.App., 350 A.2d 379 (1976). A presumption exists against ordering mental examinations. *United States v. Butler*, 156 U.S. App.D.C. 356, 481 F.2d 531 (1973); *Rogers v. United States, supra*. The trial court, in determining whether such exams are necessary must weigh the potential evidentiary advantage of the examination against the dangers of an unwarranted invasion of privacy[2] posed by such examinations, e. g., the potential harassment resulting therefrom or the likelihood that the witness may be deterred from coming forward. *See United States v. Benn*, 155 U.S.App.D.C. 180, 476 F.2d 1127 (1972); *Rogers v. United States, supra; United States v. Harrod, supra*.

■■■ Competency depends upon the witness' capacity to observe, remember, and narrate as well as an understanding of the duty to tell the truth. *United States v.*

---

1. Appellants made no pretrial motion for a physical or mental examination of Ms. Ross.

2. It should be noted that we have held that the privacy considerations are not as great when

the witness is criminally connected with the offense as they are when the witness is a mere bystander. *See Albany v. United States*, D.C. App., 377 A.2d 1145 (1977).

*Benn, supra.* A trial court's ruling on a witness' competency should not be disturbed unless the record provides unmistakable evidence that the trial court's impressions are defective. *Rogers v. United States, supra.* Reviewing the record in this case, we find no abuse of discretion. The testimony of the challenged witness, while ambiguous at times, presented a comprehensible and believable account of the robbery which was corroborated in many respects, thereby giving independent assurance of its reliability. The trial court had the opportunity to observe the witness over hours of testimony and concluded she was competent and that an examination was unnecessary. *See Smith v. United States,* D.C.App., 414 A.2d 1189 (1980). We are unable to discern any "unmistakable evidence that the trial court's impressions were defective." Accordingly, under the circumstances of this case, we hold the court committed no abuse of discretion in denying appellants' motion for compulsion of a physical and mental examination of Rosetta Ross.

## II.

Appellants Melvin and Ronnie Hilton contend that their rights to confrontation were denied by limitations imposed by the trial court on cross-examination and recross. During cross-examination, counsel for Ronnie Hilton, in questioning Rosetta Ross about her prior inconsistent statements, was attempting to discredit her and show her bias and motive for testifying. One area counsel sought to explore was Ms. Ross' knowledge concerning where appellant Livingston lived and worked. In her statement to police, Ms. Ross stated that Livingston "hangs out on Girard Street and he runs an oil joint up there, too." It was revealed to the court that an oil joint was a place where people went to inject drugs into themselves. Counsel for appellant Livingston objected to this line of questioning and his objection was sustained. On recross-examination counsel for Melvin Hilton notified the court that he intended to question Rosetta Ross about, *inter alia,* her marijuana smoking during court recess, the

money obtained in the laundromat and her scheme with Melvin Hilton to present to the police a fabricated account of events. The court prohibited questioning in those areas.

■ The opportunity for a defendant to cross-examine a witness is a matter of right. *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Johnson v. United States,* D.C.App., 418 A.2d 136 (1980); *Springer v. United States,* D.C. App., 388 A.2d 846 (1978). Moreover, the cross-examination of a witness, or presentation of evidence as to his or her bias or motive is a more particularized, and potentially more damaging, way of calling into question a witness' credibility. *Id.* However, this does not mean that cross-examination cannot be limited. The trial judge, in his discretion, may cut off further inquiry if the cross-examination becomes repetitive, protracted or cumulative, and he is given considerable discretion to control cross-examination if he concludes that the danger of the unfair or prejudicial effect of the evidence outweighs its probative value. *Brown v. United States,* D.C.App., 409 A.2d 1093 (1979). *See Smith v. United States,* D.C.App., 392 A.2d 990 (1978). "The basic right is subject to reasonable regulation by the trial court. Its regulation lies within the discretion of the trial court and reversal is warranted only where an abuse of discretion leads to prejudice." *Brown v. United States, supra* at 1100 (citations omitted).

■ Ronnie Hilton's cross-examination of Rosetta Ross was limited in only one respect—he could not delve into her statement to the police that appellant Livingston "hung out" at Girard Street and operated an "oil joint." Counsel was allowed to and did extensively cross-examine Ms. Ross concerning her motives for testifying and the inconsistent prior statements she had given to the authorities. Given the availability and pursuit by appellant Ronnie Hilton of alternative methods to achieve his objective of discrediting Ms. Ross and exposing her motive for testifying, as weighed against the prejudice to appellant Livingston that would have resulted from repeated refer-

ences to his "oil joint," we conclude that the trial court did not err in its narrow limitation of Ronnie Hilton's cross-examination.

The trial court limited the areas that Melvin Hilton's counsel intended to probe during recross-examination. We have held that there is no general constitutional right to recross-examine a witness, since the scope of the redirect examination is limited to matters which were initially raised on cross-examination, to which the opposing party is merely responding on redirect. *See Singletary v. United States,* D.C.App., 383 A.2d 1064 (1978). Therefore, the extent of recross-examination is discretionary and may be strictly limited by the trial court. *Id.* When new matters are brought out on redirect examination, however, the confrontation clause does mandate that the opposing party be allowed to recross-examine the witness concerning the new issues. *Id.* In the instant case, the line of questioning appellant sought to pursue involved no new matters but rather would have constituted a repetition of questioning pursued during cross-examination. On the state of this record, we hold that the trial court did not err in restricting Melvin Hilton's recross-examination of Rosetta Ross.

### III.

Appellants Livingston and Ronnie Hilton contend that the trial court erred in denying their respective motions for severance. Similar to his previous argument, Ronnie Hilton contends that the court's limitation of cross-examination denied him a meaningful defense, thus necessitating the granting of his mid-trial motion for severance. Appellant Livingston contends that his midtrial motions for severance should have been granted on either of two bases: 1) he was prejudiced by cross-examination of a coappellant's witness; or 2) the evidence against his coappellants was overwhelming compared to the evidence against him. We find these arguments meritless.

Generally, when two or more defendants are charged with jointly committing a criminal offense, there is a strong presumption that they will be tried together because joinder serves to expedite the administration of justice, reduce congestion of trial dockets, conserve judicial time, lessen the burdens upon citizens who must sacrifice both time and money to serve as jurors, and avoid the necessity of recalling witnesses who would otherwise be called upon to testify only once. *Jennings v. United States,* D.C.App., 431 A.2d 552 (1981); *Cunningham v. United States,* D.C. App., 408 A.2d 1240 (1979); *Johnson v. United States,* D.C.App., 398 A.2d 354 (1979). A trial court may order a severance or provide whatever other relief justice requires when a defendant is prejudiced by a joint trial. Super.Ct.Cr.R. 14. The decision whether or not to grant severance rests within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of that discretion. *Jennings v. United States, supra; Sousa v. United States,* D.C.App., 400 A.2d 1036, *cert. denied,* 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979). To prevail on appeal, appellants must prove that their rights have been prejudiced by the denial of their respective motions for severance. *Cunningham v. United States, supra.*

We hold that neither appellant Hilton's nor appellant Livingston's rights were prejudiced by joinder. The matter appellant Hilton cites was a minor intrusion in the overall context of the trial. Counsel pursued other equally effective avenues to discredit Ms. Ross and we are unable to conclude that his defense was hindered in any way.

The bases appellant Livingston cites are similarly deficient. Our review of the trial transcript fails to disclose any prejudice resulting from cross-examination of Melvin Hilton's witness John Grady. Mr. Grady merely testified that he did not know appellant Livingston nor did he know on the night of the robbery that any of the principals were still hiding in the laundromat when the police departed. Moreover, a disparity in the quantum of evidence the government possesses against codefendants,

in itself, does not support severance. In *Christian v. United States*, D.C.App., 394 A.2d 1, 21 (1978), *cert. denied sub nom. Clark v. United States*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979) we stated:

A defendant is not entitled to severance merely because the evidence against a codefendant is more damaging than the evidence against him. Manifest prejudice occurs only where the evidence of a defendant's complicity in the overall criminal venture is *de minimis* when compared to the evidence against his codefendants. [Citations omitted.]

The record in the instant case amply demonstrates appellant Livingston's participation. Consequently, we hold that the trial court did not abuse its discretion in denying his motions for severance.

## IV.

Appellant Ronnie Hilton asserts two additional errors. First, he contends that the government did not produce sufficient evidence to support his conviction for carrying a pistol without a license. At trial, the government offered the testimony of Detective Charles Dunn, who in response to the question "Did Mr. Ronnie Hilton have a license or a registration to carry a pistol ...?", stated "no sir, he did not." Appellant claims this is a conclusory statement, not based on any examination of the licensing records and therefore deficient.

On a charge of carrying a concealed weapon, the burden is on the government to prove that a defendant was carrying the weapon and that he did not have a license to do so. *Brown v. United States*, D.C.Mun.App., 66 A.2d 491 (1949). The government may prove lack of a license by the oral testimony of someone who has searched an entire group of entries and is prepared to report that it does not contain a specific entry. *See Bussie v. United States*, D.C.Mun.App., 81 A.2d 247 (1951).

In the instant case, the government produced more than a conclusory statement of a police officer. The question posed to Detective Dunn was part of a series of inquiries designed to elicit whether any of the appellants possessed licenses to carry pistols. Detective Dunn first testified that *pursuant to his investigation,* he was able to determine that Melvin Hilton did not possess a license. He then testified that *as a result of his investigation* he was able to determine that Jerome Graham possessed no license. The inquiry concerning Ronnie Hilton directly followed this. Defense counsel lodged no objection nor cross-examined the witness as to his knowledge of the records. Moreover, counsel did not request the government to produce a certificate of no license.

We find that based on the testimony as a whole, the inescapable conclusion is that Detective Dunn, when testifying that Ronnie Hilton possessed no license to carry a pistol, was basing his testimony on his investigation of licensing records. Although the method employed by the government was by no means preferred or ideal, the evidence produced was sufficient to sustain Ronnie Hilton's conviction for carrying a pistol without a license. We find the instant case controlled by *Bussie v. United States, supra.* There the court stated:

Undoubtedly it would have been better procedure to produce the official custodian of the records. But the police lieutenant who gave the testimony was liaison officer of the police department attached to the Municipal Court, and we note that the defense did not object to his testimony when it was offered and did not attempt to cross-examine him as to the extent of his knowledge or familiarity with the records. We note also that there was no contention in the trial court and none here that the lieutenant was not in a position to make a complete search of the records and to render an accurate report of what they did or did not contain. Under the circumstances we rule that the evidence of lack of a license was of sufficient probative force to meet the requirements we have stated, and certainly sufficient to take the case to the jury. [*Id.* at 248.]

Ronnie Hilton next contends that his Sixth Amendment right to a speedy trial was violated. We find this contention meritless.

Appellant was arrested on January 8, 1978. Trial was first scheduled for August 28, 1978, but because the judge assigned had a matter of priority which made him unable to preside, the case was continued to November 15 over the oral assertion by appellant of his speedy trial right. On November 15, the case was again continued due to the trial judge's inability to preside. Appellant again orally asserted his right to a speedy trial. On December 27, 1978, appellant filed a written motion for speedy trial and on January 3, 1979, that motion was denied. Trial began on January 3, 1979, (eleven months and twenty six days after arrest), and appellant did not thereafter reassert his speedy trial claim.

In reviewing claims of Sixth Amendment speedy trial violations, we apply the balancing test enunciated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Under that standard, we weigh the length of delay, the reasons for delay, the appellant's assertion of right, and the prejudice to him.

Applying the *Barker v. Wingo* test, we note that since the delay here does not exceed one year, prima facie merit does not attach to appellant's constitutional claim. *See United States v. Perkins*, D.C. App., 374 A.2d 882 (1977) (delay of 49 weeks). The reason for delay here, as both parties concede, was court congestion and administrative delays. We have held that while such neutral reasons should be considered, they should be weighed less heavily against the government than a deliberate attempt to hamper the defense,[3] *see Freeman v. United States*, D.C.App., 391 A.2d 239 (1978), and they may easily be outweighed by a low threshold of prejudice. *See Bethea v. United States*, D.C.App., 395 A.2d 787 (1978). The record reveals that appellant asserted his right to a speedy trial

early in the proceedings and such assertion is entitled to strong evidentiary weight. *See id.*

With respect to the final factor, prejudice, appellant claims that the delay and his attendant incarceration caused him anxiety and negated any assistance he could have given counsel. Because the delay here was less than a year, no presumption of substantial prejudice exists. *See Bean v. United States*, D.C.App., 409 A.2d 1064 (1979). Moreover, appellant is unable to specify how his defense was hampered; he proffers no specific evidence which has actually disappeared or has been lost, nor any witnesses unavailable to him as a result of the delay. While some minimal prejudice may result from the mere fact of incarceration, appellant's generalized claims of anxiety under the facts of this case do not support a finding of substantial prejudice. *See Day v. United States*, D.C.App., 390 A.2d 957 (1978); *United States v. Calhoun*, D.C.App., 363 A.2d 277 (1976).

Balancing the *Barker v. Wingo* factors, we conclude that Ronnie Hilton's right to a speedy trial was not violated and that the trial court was correct in denying his motion to dismiss.

## V.

Finally, appellants Melvin Hilton and Rufus Shepard contend that the government did not produce sufficient evidence to support their convictions and that the trial court, therefore, erred in denying their motions for judgment of acquittal. Their contentions are meritless.

Generally, a motion for judgment of acquittal should be granted only if it is determined from the evidence that, giving full play to the right of the trier of fact to determine credibility, weigh the evidence and draw justifiable inferences of fact, a reasonable mind could not fairly conclude guilt beyond a reasonable doubt. *In re W. K.*, D.C.App., 323 A.2d 442 (1974); *see also Borrero v. United States*, D.C.App., 332 A.2d 363 (1975). Viewing the evidence

---

3. The trial court found that the government made no deliberate attempt to delay trial.

in the light most favorable to the government, we conclude that the record adequately supports a finding of appellants' participation in the crimes. Rosetta Ross' testimony established that appellant Shepard planned the robbery and transported the principals to the laundromat. She also testified that Melvin Hilton was one of the participants, that he had pistol-whipped a patron of the laundromat and broke into a locker there to obtain money. Her testimony was corroborated in several respects by other government witnesses.[4] We conclude therefore, that the trial court did not err in denying appellants' motions for judgment of acquittal and that sufficient evidence supported their convictions.

We affirm all convictions.

4. Appellant Shepard contends that he was convicted solely on the basis of Ms. Ross' "uncorroborated" testimony and that the law in this jurisdiction prohibits convictions on the uncorroborated testimony of an accomplice. Putting aside appellant's questionable interpretation of the law, see United States v. Lee, 165 U.S.App. D.C. 50, 506 F.2d 111 (1974), cert. denied, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975), the record does reveal probative evidence corroborating the Ross testimony that Shepard remained outside the laundromat in the getaway car because he feared that he might be recognized by patrons and employees.

Independent testimony indicated that: a car parked in front of the establishment departed just prior to the arrival of the police; Shepard frequented the establishment and was familiar with the location where the proceeds were kept; and Shepard had attempted to pay a witness to inform the police that he did not participate in the criminal scheme.